IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **MIDCAP MEDIA FINANCE, LLC** § § § | |
| Plaintiff, § § | |
| V. § § | |
| **PATHWAY DATA, INC., d/b/a** § **CONSUMER DIRECT, and** § **DAVID COULTER,** § | A-15-CV-60-LY |
| § | |
| Defendants, § § | |
| V. § § | |
| **MIDCAP MEDIA FINANCE, LLC,** § **WILLIAM JEFF BLACK, and** § **ROBERT HANINGTON** § § | |
| Counter and Cross Defendants. § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:  THE HONORABLE LEE YEAKEL
     UNITED STATES DISTRICT JUDGE

Before the Court are: Counter and Cross Defendants MidCap Media Finance, LLC ("MidCap"), William Jeff Black ("Black"), and Robert Hanington ("Hanington") (collectively, "MidCap")'s Motion to Dismiss or in the Alternative Motion for More Definite Statement (Dkt. No. 12); Defendants Pathway Data, Inc., d/b/a Consumer Direct ("Pathway") and David Coulter ("Coulter") (collectively, "Pathway")'s Response (Dkt. No. 13); and Counter Defendants' Reply (Dkt. No. 19).  The undersigned submits this Report and Recommendation to the United States District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(h) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

## I.   GENERAL BACKGROUND

This is a dispute between a borrower and a lender related to an agreement to finance a media campaign. The borrower, Pathway, executed a note valued at $1,500,000 with its lender, MidCap, on July 26, 2013. As part of the note, Coulter, Pathway's president and CEO, executed a Guaranty of Repayment. MidCap brought this suit alleging that Pathway and Coulter failed to repay portions of the loan in breach of their agreement.

In addition to denying MidCap's claims and asserting affirmative defenses, Pathway brings a counterclaim against MidCap. It alleges that under the terms of their agreement, MidCap was obligated to not only provide financing, but also to provide certain services, including software, systems, analytics, and media expertise. Pathway alleges that while MidCap provided financing for a limited period of time, it failed to provide some or all of the services. Indeed, Pathway alleges, MidCap threatened to stop providing any financing unless Pathway itself designed and implemented the services, which, under duress, it did. Pathway also alleges MidCap interfered with a potential profitable sale of Pathway to a third party. Specifically, Pathway alleges that MidCap "secretly and deceitfully made contact directly with the prospective buyer" and "made false representations about Pathway to the prospective buyer, thereby convincing the prospective buyer to reduce their offer to purchase Pathway to approximately 10 percent of the amount previously discussed." Dkt. No. 8 at 13. "Further," Pathway alleges, MidCap "devised a plan that would result in most of the payment from the sale going directly from the prospective buyer" to MidCap. *Id*. The deal did not go through. Pathway also contends that MidCap contacted a merchant processor of Pathway's and demanded that the merchant processor pay 100% of the funds it owed to Pathway directly to MidCap. While the merchant processor refused to comply, Pathway alleges that the interference from MidCap was such that Pathway and the merchant processor eventually terminated their contract, causing Pathway to suffer damages. Based on these facts, Pathway brings four claims:

- Breach of contract against MidCap;

- Tortious interference with prospective business relations against MidCap, Black, and Hanington;

- Tortious interference with contract against MidCap, Black, and Hanington; and

- Fraud against MidCap, Black and Hanington.

MidCap moves to dismiss three of these claims, arguing that they fail to state a claim upon which relief may be granted. Specifically, it argues that Pathway:

- Fails to state a claim against MidCap for breach of contract because it does not identify any provision of the contract that MidCap breached;

- Has not pled its claim of fraud with the particularity required by FED. R. CIV. P. 9 (b); and

- Fails to state a claim against Hanington for tortious interference with prospective business relations because Pathway does not include any factual allegations specific to Hanington.

In the alternative, MidCap moves for a more definite statement of the factual bases and legal theories supporting these three claims.

## II.  ANALYSIS

Rule 12(b)(6) allows for dismissal of an action "for failure to state a claim upon which relief can be granted." While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations in order to avoid dismissal, the plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The Supreme Court has explained that a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim

3

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a motion to dismiss, the Court must construe the complaint liberally and accept all of the plaintiff's factual allegations in the complaint as true. *See In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2009).

**A.     Breach of Contract**

MidCap first argues that Pathway has not properly pled its breach of contract claim against MidCap. In a diversity case such as this, the court applies state substantive law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Ashland Chem. Inc. v. Barco Inc.*, 123 F.3d 261, 265 (5th Cir. 1997). To prevail on a breach of contract claim under Texas law, the plaintiff must establish: (1) the existence of a contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Lewis v. Bank of Am., N.A.*, 343 F.3d 540, 544–45 (5th Cir. 2003), *cert. denied*, 540 U.S. 1213 (2004); *Wright v. Christian & Smith*, 950 S.W.2d 411, 412 (Tex.App.– Houston [1st Dist.] 1997, no writ).

Citing a number of cases, MidCap argues that in addition to these elements, Pathway must also plead which specific portion of the contract MidCap has breached. Dkt. No. 12 at 4 (citing *Lara v. Wells Fargo Bank, N.A.,* 2013 WL 6242703, at *3 (N.D. Tex. 2013); *King v. Wells Fargo Bank, N.A.,* 2012 WL 1205163, at *2 (N.D. Tex. 2012); *Mae v. U.S. Property Solutions, L.L.C.,* 2009 WL 1172711 (S.D. Tex. 2009)). However, as Pathway notes in its response, these cases do not require that a plaintiff identify in its complaint the particular line or paragraph of the contract it contends has been breached. Rather, the cases simply emphasize that a plaintiff suing for breach of contract must allege that the defendant's conduct was not merely objectionable, but breached the provisions of the contract. For example, in *Lara* a couple alleged that their mortgage lender had withheld insurance proceeds in violation of certain provisions of the parties' contract. *Lara* , 2013

WL 6242703 at *3.  The court found that the contract did not require the lender to release the funds as the couple alleged, and because the lender's alleged behavior did not violate any provision of the contract, the couple had failed to state a claim for breach of contract.  *Id*.  Thus, though Pathway is correct that to state a claim for breach of contract, a complaint need not cite the specific clause of the contract that has been breached, the cases *do* require that the complaint allege behavior that could possibly breach some provision of the contract.

MidCap's affirmative obligations under the contract are few.  First, and most fundamentally, it agrees to provide Pathway "Media Financing Services," which are somewhat awkwardly defined in one of the "Whereas" clauses of the contract as follows:

> Whereas, [MidCap] is a specialty consultant in the business of providing funding and credit to its clients for the purchase of Media Time and/or other costs associated with the creation of revenues through the sale of [Pathway's] Products from the Funding Project ("Media Financing Services")

Dkt. No. 1-2 at 2.  In other words, Media Financing Services are "funding and credit"—in a word, "financing"—for purchases of advertising.  MidCap's obligations are expanded slightly by two other sections – Section 2 ("MCM's Responsibilities") and Section 4(b) (MidCap's "covenants").  The "Responsibilities" section obligates MidCap to:

- confirm that certain performance standards were being met before paying for bookings;

- review and approve planned bookings provided by Pathway on a weekly basis;

- "consider, in good faith" any planned bookings of Pathway's media buyer;

- establish a "Primary Bank Account" for use in the media financing; and

- invoice Pathway on a weekly basis for media costs, and provide a weekly statement of revenues received from the media campaign.

Dkt. No. 1-2 at 4-5.  In the "covenant" section, MidCap agrees to:

- be able to perform the "Media Financing Services" at all times;

- pay to Pathway the "daily 35% as specified in Schedule 2" unless that was done by a merchant processor; and

- pay Pathway the weekly balance in the Primary Bank Account if any balance existed after amounts due to MidCap were paid.

*Id.* at 9.

In its response, Pathway relies on these sections of the contract as support for its breach of contract claim. It also suggests (without explanation) that MidCap also breached Section 3(b), Section 6, Section 12, and Exhibit F of the contract. Dkt. No. 13 at 7-8. Section 3(b) contains four "warranties" of MidCap: (1) MidCap is a Texas LLC in good standing and qualified to do business everywhere needed to fulfill its obligations; (2) MidCap is not in default under any agreement which would prevent its performance under the contract; (3) MidCap's performance under the contract will not put it into default under any other agreement; and (4) neither the Media Financing Services nor MidCap are in violation of any laws, and MidCap has a reasonable basis for all claims made in connection with the Media Financing Services. Section 6 is a general confidentiality agreement, where each party agrees to keep confidential non-public information about the business of the other learned during the contract. Section 12 does not appear to create any duties for MidCap, but rather imposes an obligation on Pathway to cooperate with MidCap so that MidCap can perfect the lien granted it in the contract. Finally, Exhibit F is a schedule of outstanding debts or liens Pathway is encumbered by. It is only a list; it contains no affirmative obligations, and is only referenced in the contract to identify items that are excluded from MidCap's right to execute on the security interest Pathway grants it in the contract.

As noted earlier, the cases require a breach of contract plaintiff to allege behavior by the defendant that is in breach of some provision of the applicable contract. It is in this area that

Pathway's counterclaim comes up short.  Specifically, much of the behavior Pathway points to in its counterclaim to support the breach of contract claim is not behavior that is *even addressed* by the contract.  For example, in the "Introduction" section of its counterclaim, Pathway argues that the contract was not only a financing agreement, but "was also a service contract, which meant that MidCap would supply Pathway with the following services:"

- Industry leading systems, analytics and media expertise ("S.A.M.E.") to insure that Pathway's marketing campaigns financed by MidCap would be stable and healthy.

- Basic financing software ("B.F.S.") to ensure that the details of the financing provided under the Contract could be accurately tracked.

- Use of S.A.M.E. to carefully monitor and identify fraud, as well as marketing campaigns which were not performing profitably.

- Sophisticated market intelligence to track the tricks of bad marketing partners/affiliates.

- Weekly recommendations and analyses.

Dkt. No. 8 at ¶ 3.  But such promises are nowhere to be found in the contract.  Indeed, a search of the contract reflects that neither the acronyms, nor the full phrases for, "S.A.M.E." or "B.F.S."—or any analog thereof—are ever mentioned.  The contract also does not once state that MidCap would monitor or identify fraud, nor does it ever reference that MidCap was obligated to use market intelligence to track bad marketing partners.

Similarly, in the breach of contract count, Pathway details seventeen separately-enumerated ways in which it contends MidCap breached the contrat, quoted verbatim here:

a.   Failing and refusing to provide S.A.M.E. and B.F.S.

b.   Forcing Pathway to provide B.F.S. without consideration and despite the fact Pathway is not a finance company and not experienced and had never built a B.F.S.

c. Failing and refusing to provide Pathway with an accounting, accounting system references, invoices, ledgers or statements or reconciliations.

d. Concealing the fact that MidCap was formed just days before the Contract was executed and that it lacked the qualifications, ability and intent to perform under the Contract.

e. Representing falsely that it had B.F.S. and industry leading S.A.M.E. in order to induce Pathway to enter into the Contract.

f. Representing falsely that its S.A.M.E. would carefully monitor and identify fraud as well as marketing campaigns which were not performing profitably.

g. Representing falsely that it was one of the largest media financiers in the nation that specialized in online continuity programs similar to Pathway's, and that it had the most sophisticated fraud and campaign health systems in the nation.

h. Representing falsely that it had developed sophisticated market intelligence over many years, and that [MidCap] knew which marketing partners to avoid and the tricks they played to ensure the health of the financed marketing campaigns.

i. Failing to use or have S.A.M.E. which directly caused the marketing campaigns that MidCap financed to fail.

j. Failing to use or have B.F.S. to track the details of the financing provided under the Contract or the underlying third party invoices which were financed.

k. Forcing Pathway to build and maintain a B.F.S. so that MidCap could render its performance under the Contract.

l. Threatening to terminate financing under the Contract if Pathway did not create and maintain B.F.S. without due consideration, testing or independent verification.

m. Failing and refusing to provide Pathway with a full accounting of the marketing campaigns governed by the Contract.

n. Failing and refusing to provide to Pathway any document or other report of any type that indicated any financial details of the transactions allegedly

        financed by MidCap under the Contract, such as financing use, principle or interest owed, or funds sent and received.

    o.    Failing to refer or engage a merchant processor who would distribute daily proceeds with a "split" of 65% to Midcap and 35% to Pathway and thereafter provide a weekly reconciliation and return of overage funds to Pathway. This Contract inducing claim from Counter and Cross-Defendants that all merchant processors do this split was a false or impossible representation by Counter and Cross-Defendants. Not only did Pathway not find any merchant processor who would do this split, but even the merchant processors Counter and Cross-Defendants recommended to Pathway did not do this split.

    p.    Relying on a known unreliable spreadsheet provided by Pathway as the basis for its financial tracking and invoicing.

    q.    Allowing Pathway's marketing campaigns to fail by allowing unfiltered and unmonitored fraudulent marketing by third party marketing partners to warp and distort the economics of the marketing campaigns Midcap financed for Pathway.

Dkt. No. 8 at 21-23.

    Comparing these allegations with the contract reveals that nearly all of the allegedly "breaching" behavior pled by Pathway has no obvious basis in the written contract. Indeed, many of the allegations read as accusations of fraud in the inducement, rather than breach of contract. Of the seventeen alleged breaches set out in ¶¶ 37(a) - (q) of the counterclaim, the Court can identify only three which appear to have a source in the contract's terms:

    (1)    MidCap failed to provide invoices (¶ 37(c)), in breach of Section 2(e) of the contract;

    (2)    MidCap lacked the ability and intent to perform under the contract (¶ 37(d)), breaching Section 4(b)(i) of the contract; and

    (3)    MidCap failed to provide a document or report indicating the financial details of the media purchases MidCap financed (¶ 37(n)), in breach of Section 2(e) of the contract.

With these three exceptions, the Court cannot find any contract language to support Pathway's breach of contract allegations, nor does Pathway point the Court to any such language, except to generally contend that the behavior violated contract sections 3(b), 6, 12, and Exhibit F. But as

already discussed, with the three exceptions already noted, nothing in these clauses appears to address the behavior pled in ¶¶ 37(a) - (q). As a result, these claims (¶¶ 37(a)-(b), (e)-(m), and (o)-(q)) fail to state a breach of contract claim on which relief may be granted. The Court thus recommends that the District Judge dismiss these claims, without prejudice to Pathway repleading these claims if it believes that there is some basis in the contract to support them, in which case it should be required to plead the facts as well as the specific contract provision those facts show has been breached.

**B.**     **Fraud**

MidCap next argues that Pathway has failed to meet the heightened pleading requirement for a fraud claim. In addition to having to meet the pleading requirements of Rule 8, fraud claims must also comply with Rule 9(b), which demands that a party "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *see United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 468 (5th Cir. 2009). Rule 9(b) is interpreted strictly, and a plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir.) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)), *cert. denied*, 558 U.S. 873 (2009).

"As a general rule, the failure to perform the terms of a contract is a breach of contract, not a tort. However, when one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex. 1992) (citations omitted). A promise of future behavior constitutes fraud only when made with the intent to deceive; it must be a promise made with no intent to perform the act. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986). "Failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the

promise was made, but a circumstance to be considered with other facts to establish intent." *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 444 (Tex. App.-Houston [14th Dist.] 1998, pet. denied).

As with their breach of contract claim, Pathway's fraud allegations are voluminous. Dkt. No. 8 at 26-29. Pathway repeats many of the same allegations it made regarding breach of contract, including that MidCap promised to provide certain services but failed to deliver. *Id*. There is no question that these allegations are sufficiently specific to adequately describe the alleged statements made, and the fraudulent aspect of each for Rule 9 purposes. What is lacking is the identity of the speaker, and when and where the statements were allegedly made.[1] As such, Defendants' pleadings do not comply with FED. R. CIV. P. 9, and should be dismissed without prejudice to being repled to cure the deficiency.

C. **Tortious Interference with Prospective Business Relations**

Finally, Counter Defendants argue that Defendants have failed to adequately plead their claim for tortious interference with prospective business relations against Hanington because they have not included any allegations of wrongdoing by Hanington himself, only general allegations against all of the Counter Defendants collectively. To state a claim for tortious interference with prospective business relations, a plaintiff must establish, among other things, that "an intentional, malicious intervention or an independently tortious or unlawful act was *performed by the defendant* with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially likely to occur as a result of its conduct." *U.S. Enercorp, Ltd. v. SDC*

---

[1] Even assuming a statement in a response is a sufficient manner by which to cure a pleading defect, Pathway's assertion in its response that the statements were made by MidCap or Black or Hanington, "before, during and after the contract was signed," and were made in Pathway's offices, MidCap's offices or over the telephone, is insufficient. It must allege as much information as it has about when *each* statement was made, who made that statement, and where the statement was made.

11

*Montana Bakken Expl., LLC*, 966 F. Supp. 2d 690, 702 (W.D. Tex. 2013) (emphasis added). MidCap argues that Pathway has failed to allege that Hanington himself—separately from Black or MidCap—committed an intentional, malicious intervention or an independently tortious or unlawful act.  It notes that Pathway has made such a claim about Black, alleging that he made slanderous statements to One Technologies, a potential purchaser of Pathway.  Dkt. No. 8 at 24.

Though MidCap is correct that Pathway has not identified specific conduct by Hanington as it has with Black, Pathway does include him as one of the "Counter and Cross-Defendants" that Pathway contends "made false and fraudulent statements about Pathway to One Tech, thereby convincing One Tech to reduce their offer to purchase Pathway to just 10 percent of the amount previously anticipated."  *Id*.  Though general, this accusation is sufficient under Rule 8 to state a claim for tortious interference with prospective business relations.

### III.  RECOMMENDATION

Based upon the foregoing, the Magistrate Court **RECOMMENDS** that the District Court **GRANT IN PART AND DENY IN PART** Counter and Cross Defendants' Motion to Dismiss or in the Alternative Motion for More Definite Statement as follows:

As to Defendants' breach of contract claims, the Court recommends that, except as to the claims labeled ¶ 37(c), (d), and (n), the motion be **GRANTED** without prejudice to Pathway repleading these claims if it believes that there is some basis in the contract to support them, in which case it should be required to plead the facts of each breach, as well as the specific contract provision those facts show has been breached.

As to Defendants' fraud claims, the Court recommends that the motion be **GRANTED** without prejudice to Pathway repleading the fraud claim to state who made each statement, and when and where it was made.

As to Defendants' claim of tortious interference with potential business relationship, the Court recommends that the motion be **DENIED**.

Finally, the Court recommends that the alternative motion for a more definite statement should be **DISMISSED AS MOOT**.

## IV.  WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 11th day of December, 2015.

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE