**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **MIDCAP MEDIA FINANCE, LLC** | § | |
| | § | |
| **V.** | § | **A-15-CV-60-AWA** |
| | § | |
| **PATHWAY DATA, INC., et al.** | § | |

## MEMORANDUM OPINION AND ORDER

In January 2015, MidCap Media Financing, LLC filed this lawsuit. The Court has held a bench trial, at which it heard testimony from Robert Hanington and David Coulter. Additionally, testimony from Mee Chau, Vannak Kho, and Clay Myers was provided via deposition designations, and each side submitted a number of exhibits. The parties thereafter submitted post-trial briefing. Having considered the evidence and testimony at trial and the post-trial briefing, the Court enters the following Memorandum Opinion and Order.

## I. FINDINGS OF FACT[1]

### A. Breach of contract claims

In July 2013, MidCap Media Finance, LLC and Pathway Data, Inc. entered into a Media Financing, Security, and Assignment Agreement (the "Agreement") that provided Pathway up to $1,500,000.00 in financing for online media campaigns. P-5. MidCap is a "media-funding business," that provides credit lines to fund media campaigns to companies that do direct-response online selling. Vol. 1 Tr. 21; P-5 at 1. Pathway is an online company that provides credit services to consumers. *Id.* at 168. Pathway's primary product at the relevant time was a credit monitoring software called SmartCredit.com, which was sold directly to customers through online media

---

[1]The Court sets out its findings and conclusions in narrative form. To the extent that any finding of fact is more appropriately considered a conclusion of law, or vice verse, then such findings or conclusions are deemed as such.

campaigns. *Id.* at 168-69. Attached as Appendices to the Agreement were a Limited Power of Attorney to MidCap, and Pathway CEO David Coulter's Guaranty of Repayment, both of which were executed at the same time as the Agreement. *Id.* at 24, 25.

The Agreement contemplated that Pathway would obtain "Bookings" from various Media Buyers—defined in the Agreement as "agent[s] hired by [Pathway] to negotiate and purchase on behalf of [Pathway] all advertising for the Funding Project." Pathway would then forward the Media Buyers' invoices to MidCap for payment. P-5 at 2, 4; Vol. 1 Tr. 30. MidCap was to pay the Media Buyers directly on a weekly basis. Vol. 1 Tr. 31, 54. To have media invoices paid, Pathway would first review and approve the invoice, P-5 at 4; Vol. 1 Tr. 30-3, and then forward it to MidCap for payment. MidCap only refused to finance invoices on two occasions: first, when the invoices had not been provided timely, and second, after March 2014 when Pathway completely stopped making payments on the loan. P-25 ("These Swapalease invoices will not be financed by us as they are far too old."); Vol. 1Tr. 31, 83. MidCap never refused to fund any invoices for any other reason. Vol. 1 Tr. 83.

The Agreement contemplated that a "primary bank account" would be established, into which all funds derived from the media campaign financed by MidCap and processed by Pathway's credit card processor would be deposited. P-5 at 5, 31. Those funds would then be split as set out in a schedule to the Agreement, which provided:

REVENUE SPLIT

| Split | Amount | Frequency |
|-------|--------|-----------|
| 65/35 | 35% of settled Revenue deposited directly to Client's bank account with remaining balance of 65% of settled Revenue being first utilized for scheduled weekly repayments of Invoices with overages during the week swept to the Client's bank account weekly. | Daily |

P-5 at 31. Though this was the parties' plan, they were unable to find a merchant processor that had the ability to make this 65/35 split. *See, e.g.*, P-28A; Vol. 1 Tr. 83-85; Chau Dep. 87:11–14; Kho Dep. 40:15–18. As a result, the contemplated bank account was never created, and all of the funds processed by the merchant processor were sent to Pathway; and Pathway was required to transmit payments on the loan to MidCap weekly. Vol. 1 Tr. 55; Chau Dep. 87:25–88:3. The repayment period for each loan amount MidCap extended—each paid invoice—was 32 weeks. P-5 at 3; Vol. 1 Tr. 5, 172. The interest and repayment schedule in the Agreement was complex:

**SERVICE FEE RATES**

| Service Fee Rate/Week | Formula: Service Fee * Outstanding Unpaid Invoice |
|---|---|
| 1.10% | For weeks 1 – 4 |
| .5875% | Until Invoice balance is paid in full |

**INVOICE REPAYMENT SCHEDULE**

| Period | Invoice Payment Curve Percentage |
|---|---|
| Weeks 1-8 | 4% of the Total Media Advance + Service Fee |
| Weeks 9-24 | 3.125% of the Total Media Advance + Service Fee |
| Weeks 25-32 | 2.25% of Total Media Advance + Service Fee |

**Example:** On week 1, a $250,000.00 advance is made for media purchases. That same week, a service fee of $2,750.00 is generated ($250,000 * 1.1%). The principal amount that is due for week 1 is $10,000.00 ($250,000 * 4%) bringing the total paid for week 1 to $12,750.00. In subsequent weeks, the principal amount stays on schedule but the actual amount of the weekly service fees goes down as the principal outstanding balance is reduced.

P-5 at 31.

The Agreement required that MidCap invoice Pathway weekly, setting forth the amount due that week on monies MidCap had advanced. P-5 at 5. In one of the many instances in which the parties appear to have deviated from the Agreement, the evidence demonstrated that MidCap in fact never sent Pathway a document titled "invoice." Vol. 1 Tr. 102 ("Q: Did you — when you first advance[d] funds on behalf of Pathway, did you send Pathway a weekly invoice? A: No. We used

the master spreadsheet as our invoice."); Chau Dep. 129:1-9. Early in the relationship, Pathway's

Operations Manager, Mee Chau, developed a spreadsheet keeping track of the amounts MidCap had

funded on Pathway's behalf, as well as the interest due on those payments. Vol.1 Tr. 40–41; Chau

Dep. 51:20–2; P-7A. The spreadsheet included information on each media invoice MidCap had

paid, the interest accrued on it, and the payments made by Pathway. *See, e.g.*, P-7B, P-28B, & P-

29B. Chau and Vannak Kho, Pathway's Controller, updated the spreadsheets weekly, and provided

them to Hanington on a regular basis. Vol. 1 Tr. 41-42, 103; Chau Dep. 51:17-22. From then on,

the parties relied on the spreadsheet to know what Pathway owed MidCap. Chau Dep. 49-50; 75:20-

76:11; Kho Dep. 28:8-11, 93:21-24. Until this litigation began, both parties regularly used the

spreadsheets, and neither party ever claimed the spreadsheets were inaccurate. *See, e.g.*, Chau Dep.

52:12-16, 78:3-8, 153:25-154:7; Kho Dep. 21:19-25.

Importantly, the evidence at trial demonstrates that Pathway never complained that it was not

receiving a weekly "invoice" from MidCap. Other than Coulter's testimony—which the Court does

not find credible—Pathway was unable to present any evidence that it objected to the use of the

spreadsheets or the lack of an invoice.[2] Vol. 1 Tr. 195–96 (testifying that Pathway produced no

documents in which it requested invoices). Coulter claimed at trial that he called Hanington on

multiple occasions to complain about the spreadsheets, yet Pathway did not submit a single email

memorializing any such discussion. *Id.* 187, 195; Vol. 2 Tr. 41 ("Q: Why is it that there's been no

document produced in this case where you sent a request to Mr. Hanington asking for this accounting

if it was so important to you? A: I was on the phone with him all the time. That was my primary

_____

[2]The fact that Pathway relegates nearly this entire argument to a single footnote in its brief,
citing no testimony or exhibits, is another indication of how weak it is.

4

means of communication with him."). Further, Hanington directly denied the claim that Coulter had complained about the spreadsheets repeatedly.[3] Moreover, Pathway's primary day-to-day managers, Kho and Chau, both testified that they never objected to the use of the spreadsheets. Chau Dep. 79:24–80:4; Kho Dep. 33:7–13, 33:23–34:1; *cf.* Vol. Tr. 1 187-89 (Coulter testifying about an email from Chau that provided an updated spreadsheet). Nor did Chau or Kho recall Coulter ever objecting to the lack of invoices prior to the start of the litigation. Chau Dep. 30:10-19, 47:13-17, 82:1-12. Based upon all of this testimony, the Court concludes that the parties adopted the practice of using the master spreadsheet in place of weekly invoices.

Only a few months after the Agreement was executed Pathway began to have trouble making payments on the loan. Vol. 1 Tr. 39. After negotiations related to some of the claims ultimately brought in this lawsuit, MidCap agreed to allow Pathway to make interest only payments for a short period. *Id.*; P-28A. Just months later, however, even these payments fell behind. Vol. 1 Tr. 56. Thus, in July 2014—only one year after the Agreement was signed—MidCap sent Pathway a Notice

---

[3] Q:  Did anyone at Pathway ever request that MidCap provide them with additional financial information related to the agreement that was not included in the various spreadsheets?

A:  No.

Q:  Did anyone at Pathway ever state that the financial information set forth in the spreadsheets was not sufficient under the agreement?

A:  No.

Q:  Did anyone at Pathway ever say that they were not aware of the amounts that they borrowed, the amounts they paid, the amounts due or owing under the agreement?

A:  No.

Q:  Did anyone at Pathway ever say that the agreement required MidCap to provide Pathway with additional financial information or invoices other than what's reflected in the spreadsheets we've discussed?

A:  No.

Vol. 1 Tr. 61.

to Cure letter stating that Pathway was in default, and accelerating the entire outstanding amount due. P-15 at 2. It then sent a formal notice of default two weeks later. P-16. Pathway has, as of this date, failed to pay the amount outstanding under the Agreement.

### B. Failure to provide additional services

Coulter testified at trial that MidCap had committed in the Agreement to provide more than simple financing; he claimed the parties also intended MidCap to provide consulting services related to the media campaigns themselves. Vol. 1 Tr. 249. For example, Coulter testified that Midcap—through its manager Robert Hanington and managing partner Jeff Black—made representations "that they had this software to handle the sophistication of the contract." Vol. 2 Tr. 31. According to Coulter, MidCap was supposed to provide "sophisticated financial software" and "systems analysis and media expertise" in addition to the media funding. Vol. 1 Tr. 250 (referring to these alleged requirements by the acronyms "BFS" and "SAME"). Moreover, Coulter testified, MidCap was supposed to "look at marketing partner data and invoices in order to ensure that the fraudulent campaigns were kept out of customer traffic." Vol. 2 Tr. 32. Pathway allegedly chose MidCap for financing based on its expertise in these areas, as Pathway "didn't have the capability" to assess the profitability of its campaigns. *Id.* 37; Vol. 1 Tr. 249–50.[4] From Coulter's standpoint, the Agreement was to be more than a credit line to fund media campaigns; MidCap was allegedly obligated to provide anti-fraud services, and profitability analyses on these campaigns as well. Vol. 1 Tr. 253; Vol. 2 Tr. 4.

---

[4] *But see* Kho Dep. 59:18–21, 60:4–6 ("Q: Do you recall that Pathway did in fact analyze media efficiency of their marketing efforts? A: Yes.").

The Court finds that this testimony by Coulter was not credible. As elaborated on at length in the Conclusions of Law, Coulter's claim of what MidCap was obligated to do is inconsistent with the contract between Pathway and MidCap, and was not supported even by Pathway's COO and Controller, nor by the actions the parties actually took during the time the contract was in place. Hanington, a MidCap manager, credibly testified that the Agreement was only ever a contract to provide financing for media bookings. Vol. 1 Tr. 28–29. He stated that MidCap never had a role in selecting or approving media partners, determining whether acquired customers were acceptable, or providing consulting in anything other than the financing it provided. *Id.* Nor did Pathway ever present any evidence, aside from Coulter's unreliable testimony, that MidCap was required to provide these additional services.[5]

## C.  Interference with Newtek contract

Shortly after MidCap declared the loan in default and demanded payment, an attorney for MidCap sent a letter to Pathway's merchant processor at the time, Newtek Merchant Solutions. D-10. The attorney's letter requested that Newtek "hold—and not disburse to [Pathway] or any other person or entity—any and all funds received by [Newtek] in connection with any account(s) of [Pathway]." *Id.* The letter cited the Agreement, stating that MidCap "ha[d] the right to notify and collect directly from various sources, including credit card processors, any revenues of [Pathway]" as a result of Pathway's default. *Id.* Over the next month, MidCap, primarily through Hanington, had a number of discussions with Newtek, but none led to Newtek sending any funds MidCap's way. Nothing further occurred until new counsel for MidCap sent an additional demand in December

---

[5] *Cf.* Chau Dep. 92:24–93:3, 105:2–7, 107:13–109:2 (testifying that she had never heard that MidCap was required to provide these services); Kho Dep. 43:11–16, 50:21–51:21 (same).

2014 that Newtek retain funds otherwise due to Pathway. D-12. This led to an attorney for the "DB7C-2002 Trust"—a trust of which Coulter is the sole trustee and a beneficiary (Vol. 1 Tr. 211)—sending a letter to Newtek demanding that the funds not be retained, and that they be sent to the Trust, purportedly based on a note and security interest held by the Trust, payable by Pathway, which was allegedly in default. P-3. Coulter also sent a letter at the same time, on behalf of Pathway, "authorizing" the transfer to the Trust. P-2. The same attorney representing the Trust also sent a letter to MidCap demanding that MidCap withdraw its request that Newtek hold funds due to Pathway. P-33. Refusing to be stuck in the middle of Pathway and MidCap's dispute, Newtek threatened to terminate its relationship with Pathway unless all parties withdrew their requests. D-14 at 3. Ultimately, Newtek did not cease its credit card processing relationship with Pathway, that relationship continued, and all of the funds that had been retained were transmitted to Pathway. Vol. 1 Tr. 209-10, 219.

## II. CONCLUSIONS OF LAW

MidCap alleges that Pathway failed to pay the amounts due under the Agreement, and seeks judgment for the amount of the debt owed plus interest. It also sues Coulter individually under his guaranty. Pathway does not deny that it failed to pay MidCap. Instead, it claims that it was excused from paying because MidCap failed to perform its own obligations under the Agreement. Pathway also filed a counterclaim in which it makes an affirmative breach of contract claim (based on the same arguments), and a tortious interference with contract claim, based on the episode with Pathway's credit card processor, Newtek.[6] Because Pathway does not contest the failure to pay, the

---

[6]Pathway additionally sued Hanington and Black for fraud and tortious interference with a prospective business relationship. Both claims were dropped the first day of trial. Vol. 1 Tr. 13.

Court will start by discussing Pathway's claim that MidCap failed to perform obligations under the Agreement.

## A.    Pathway's Breach of Contract Claim

Pathway bears the burden of proof on this claim.  A party claiming breach of contract must prove "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."  *Smith Int'l, Inc. v. Egle Grp.*, LLC, 490 F.3d 380, 387 (5th Cir. 2007).  Here, neither party disputes the existence of the contract, which was admitted as P-5.

### 1.    MidCap's Alleged Failure to Perform

Pathway makes the claim that MidCap breached the agreement both as a defense to MidCap's breach of contract claim, and as a separate affirmative claim.   Pathway argues that MidCap failed to perform two requirements of the contract: (1) "confirm all Minimum Performance Standards prior to the payment of any Cost of Bookings;" and (2) provide invoices on a weekly basis to Pathway. These failures, Pathway argues, excused Pathway's obligation to pay back the amounts that MidCap paid for Pathway's advertising purchases.[7]

#### a.    Minimum Performance Standards

Pathway contends that the contract required MidCap to confirm that each invoice it paid conformed with certain minimum performance standards set forth in the Agreement.  Dkt. No. 91 at 9.   Pathway further argues that if an invoice failed to meet these standards, MidCap was

---

[7]MidCap contends any obligation to confirm minimum standards before paying invoices was at best a condition precedent under the Agreement, and argues that Pathway's failure to properly plead it as a condition precedent forecloses Pathway's ability to make the argument. Dkt. No. 89 at 12-13.  The Court need not decide whether the issue was properly pled, because—as is set forth in the text—regardless of how the argument is characterized, it does not have merit.

contractually required not to pay the invoice. *Id.* Pathway claims that MidCap's funding such invoices was a breach of the Agreement and excuses Pathway's duty to repay MidCap those amounts. *Id.* at 15–16; Vol 2 Tr. 45. In support of its argument, Pathway identified at trial a number of invoices it claimed did not meet the minimum performance standards. *See* D-30. MidCap, on the other hand, argues that its "*only* role in the funding process was to pay invoices," and even if there was a duty to confirm the minimum performance standards prior to funding, the evidence fails to prove the invoices did not meet those standards. Dkt. No. 89 at 10.

The Agreement provides that Pathway was to send MidCap invoices for "Cost of Bookings" that it received from its "Media Buyers." P-5 at 4-5. MidCap—as Pathway's lender—would then pay the Media Buyers directly, and Pathway was required to repay those amounts plus interest over a 32 week period. *Id.*; Vol. 1 Tr. 31. The portion of the Agreement at issue provides as follows:

> 2. **MCM's Responsibilities.** Subject to the terms and conditions of this Agreement, MCM shall, on behalf of Client, pay to the Media Buyer the Cost of Bookings for advertising which must be approved by Client in writing (e-mail approval to be considered an acceptable writing) and upon meeting all the minimum performance standards listed in Exhibit B; be accepted by MCM, and shall Invoice Client for any amounts paid to the Media Buyer for such Media Time (or other third parties as MCM and Client may agree to in writing from time to time) or for any other amounts due to MCM by the Client under this Agreement including but not limited to the Cost of Bookings and Services Fee up to the Maximum Credit Limit. The payment by MCM of such amounts shall, in addition to any and all other terms contained herein, be subject to the following terms and conditions:
>
> > a.) MCM shall confirm all Minimum Performance Standards prior to the payment of any Cost of Bookings. MCM shall have the right not to fund any Cost of Bookings if in its sole reasonable determination the Funding Project has not met or is not meeting the Minimum Performance Standards, as set forth herein.

P-5 at 4.

The parties construe this language differently.  Pathway argues that the Agreement only permitted MidCap to pay an invoice if it met "all the minimum performance standards" set forth in Exhibit B.  That is, Pathway contends that this provision not only required MidCap to confirm that minimum performance standards were met, but also obligated MidCap to refuse to fund any invoices that did not meet the standards.  For its part, MidCap contends that the contract language makes it clear that though it had the right to refuse to pay an invoice it considered to be below the performance levels, it was not *required* to do so, and Pathway was obligated to repay all amounts MidCap fronted for advertising services, full stop.  The Court agrees.

The Agreement clearly states that MidCap shall accept any invoices that Pathway has approved, subject to *Midcap's* "right not to fund" an invoice not meeting the standards.  That is, paragraph two of the Agreement gives MidCap the *right* to refuse to fund any invoices below the minimum performance standards, but not the duty to do so.  This is made even more clear by the fact that the decision regarding whether a media purchase met the minimum conditions and should be paid, was *MidCap's* to make "*in its sole reasonable determination*."  P-5 at 4.  Thus, it was MidCap and MidCap alone, that had the discretion to determine whether the standards were met, and it was MidCap's *right*—not its obligation—not to fund an invoice.  *Id.*; *see also* Vol. 1 Tr. 86 (describing situations when MidCap might choose to fund invoices that do not meet minimum performance standards).[8]  Further, though the Agreement gave MidCap the right to approve both media buyers and media time, it created no correlative obligations on MidCap.  P-5 at § 4(a)(vii).  Most

---

[8] Further bolstering this conclusion, the Agreement in several other places granted MidCap the "right not to fund" advertising.  P-5 at § 4(a)(i) (right not to fund if, "in its sole reasonable discretion" it believes Pathway will not be able to service a customer); § 4(a)(ii) (right not to fund if it did not receive reports on campaign); § 4(a)(vi) (right not to fund if Pathway is not responding to customer service inquiries).

importantly, nowhere does the Agreement state that MidCap was to oversee, interact with, or otherwise supervise any of the media buyers. And as for data on media campaigns, rather than suggesting that MidCap would be keeping and analyzing such data, the Agreement obligated Pathway to provide such data to MidCap. *Id.* at § 4(a)(viii) ("[Pathway] and Media Buyer shall provide to MCM a detailed summary of the orders [Pathway] generated through all marketing channels against the media billed for the same period on a weekly basis," as well as "a weekly reconciliation of the orders placed, processed and fulfilled by" Pathway).

Even if Pathway's construction were accepted, Pathway would still be in debt, just to the advertiser, not MidCap. It was Pathway that selected and contracted with media purchasers. Either Pathway directly, or agents acting for Pathway, purchased the online advertising. The invoices for the ads were sent to Pathway, and Pathway would forward them on to MidCap for payment. Thus, if Pathway's position on this contract language is adopted, when MidCap received an invoice that fell below the performance standards, MidCap was obligated to refuse payment on the invoice. But since the media purchase was already complete, and had been made by Pathway, Pathway was still on the hook for that invoice. The only difference would be that Pathway's creditor in that instance would be the advertiser, not MidCap. Coulter conceded all of this at trial. Vol. 1 Tr. 174, 177-81. His only qualification on these admissions was his claim that he expected MidCap to step in and "fix" things if the advertising went awry:

> So my expectations were that if there was an invoice that violated [the performance standards], that [MidCap] would step up to the plate and they would say, wait a minute, let's as a group go back to this marketing partner and let's beat them up. Let's get some concessions and let's make sure they don't do that again. And not one time did they do it.

Vol. 1 Tr. 253.

This theme—that monitoring the advertising was MidCap's, not Pathway's, responsibility—was a common thread running throughout Coulter's trial testimony. He claimed that Pathway transferred all control over, and bore no responsibility for, the marketing that Pathway was purchasing; rather, the advertisers and MidCap were in charge of that:

> Q.    Okay. And we've used the term "media campaign," I believe, during the trial. What is a media campaign?
>
> A.    A media campaign is where you hire third-party marketing groups or marketing agencies *and they do whatever they do to drive in consumers to enroll in your services, your online services.*

Vol. 2 Tr. 19 (emphasis added).

> Q.    Okay. Is there any input that you had – when I say you, I mean Pathway – on where Affiliate would advertise? What web pages or the content of the advertising? Is there any control that was kept by Pathway on that?
>
> A.    It couldn't include things like porn. It couldn't include things where consumers had opted in. Some of the normal and usual things were controlled, yes.
>
> Q.    But other than that, it was their discretion to decide.
>
> A.    Correct.

*Id.* at 85-86. Coulter also claimed that MidCap was supposed to coordinate media purchases with the advertisers directly, leaving Pathway out of the process entirely:

> Q.    I had some questions about your relationship with the buyers, the media buyers and decisions on things. Looking at this contract, it appears that if you'll put—it's Plaintiff's 43, the first page, the asterisked items on the terms and restrictions—the budget for paid media and a budget for the CPA campaign.
>
> A.    Yes.
>
> Q.    Both of those are to be decided, it says, on a case-by-case basis. That's something that Pathway would make decisions about, how much to spend?
>
> A.    I believe so. Yes.

Q.      Okay. So, I mean, there was some kind of governor on Affiliate Media. They couldn't just go spend whatever they wanted on – and then, bill Pathway for it.

A.      Yes. *Well, MidCap and Affiliate Media were working together.* They were familiar we had the $1.5 million line of them, so they were kind of doing the math in their heads, I suppose.

Vol. 2 Tr. 83-84 (emphasis added).  He also claimed that it was MidCap's responsibility to make

sure Pathway was getting value for its advertising:

A.      Well, under the contract, those would have been MidCap's obligations for them to maintain the minimum performance standards and evaluate the ratios, so we wouldn't have done that prior to passing off an invoice because my understanding of the agreement is that was MidCap's responsibility.

Q.      So what you're telling us is that if your company receives an invoice from one of its media partners who you're obligated to pay, regardless of whether MidCap funds that invoice, you're just going to pass that invoice on to MidCap and say, oh, MidCap, do your magic and then, pay this? Is that what you're telling us?

A.      Under this particular agreement, MidCap had a set [of] defined rules that it was going to abide by that we had negotiated over 15 months, and it is my understanding that they accepted the role to keep certain ratios in line and verify those ratios before they funded any invoice.  It was not our responsibility under this agreement.

Vol 1. Tr. 178-79.

The problem with all of this is that none of Coulter's descriptions of the contracts is

consistent with what the contracts actually say.  First, the party that had contractual control over

media expenditures was Pathway, not MidCap.  P-43.[9]  Affiliate was chosen by Pathway (not

MidCap), and Pathway had a relationship with Affiliate that predated the MidCap loan. Vol. 1 Tr.

28; 173-74.  Pathway's contract with Affiliate anticipated that *Pathway* would set a budget.  Yet,

_____

[9]Pathway objected to P-43 arguing it had not been identified as a potential exhibit prior to trial.  Vol. 2 Tr. 81.  MidCap made a similar objection to D-30.  Vol. 1 Tr. 238.  Finding no prejudice to either party, the Court will overrule both objections, and both exhibits (which were provisionally admitted) will be considered by the Court.

according to Coulter, Pathway never exercised that control, and apparently left it to the advertisers to decide how much to spend. When asked whether Pathway established a budget with its advertisers, Coulter seemed not even to understand the question:

> Q.    But did you – I mean, did Pathway maintain some control over what was being spent on its behalf?
>
> A.    Only in the sense that once we started working with MidCap, the invoices would just have a quick validation by Mee Chau, and then, she would pass it on. If we were to see an invoice that came across for like 500,000, or some absurd number, we would probably raise some questions, I'm sure.
>
> Q.    Let me go back then. Was there a budget? It says here in this contract [with Affiliate Media] that you were going to agree on a budget both for the paid media and for the CPA campaign.
>
> A.    These are on a case-by-case basis. So my understanding is that they would send invoice by e-mail to Mee Chau. She would validate it, she would confirm it.
>
> Q.    But I'm talking about even before that. Did – at any point, did you give Affiliate Media a budget about how much to spend?
>
> A.    I don't recall that we gave them an actual dollar amount. It was just kind of on a case-by-case basis. You're talking about before, right?
>
> Q.    Well, I mean, after you signed [the Affiliate Media] contract on August the 14th, it suggested to me at least, the way I'm reading this, that there would have been an agreed-upon budget of some sort that you maintain some control over what Affiliate Media was spending.
>
> A.    Oh, I see your question.
>
> Q.    I mean, did you tell them $10,000 a month, $20,000 a month? Or was there some sort of –
>
> A.    I see your question. So this established a $3,000-a-month management fee, and the others involved in that, *they could have gone up to the full allotment that MidCap would finance*.

Vol. 2 Tr. 84-85 (emphasis added). So the only budget Pathway ever set with an advertiser was the full extent of its $1.5 million borrowing limit from MidCap. Further, contrary to Coulter's testimony, the advertising contract provided that the advertiser (not MidCap) was to track the ads and their success, and Pathway was to confirm that. P-43 at § 3(g) (noting that all campaigns will establish delivery management standards); § 4(a) (discussing "Delivery Measurement Standards" for display advertising); § 5(a) (setting standards for cost per action campaigns); § 10(b) (making it Pathway's responsibility to "validate all impressions, clicks, leads and/or acquisitions").

As far as the Pathway/MidCap agreement is concerned, the Court has already discussed at some length that Coulter's claims about the Agreement, and his insistence that it imposed significant duties on MidCap, are equally inaccurate. The Agreement simply did not impose on MidCap any responsibility to oversee the advertising Pathway purchased with MidCap's funds.[10]

_____

[10]Since this case was filed, Pathway has been making claims that the Agreement imposed obligations on MidCap that cannot be found in the contract. More than two years ago, in addressing MidCap's motion to dismiss the breach of contract claim, the undersigned noted that:

much of the behavior Pathway points to in its counterclaim to support the breach of contract claim is not behavior that is *even addressed* by the contract. For example, in the "Introduction" section of its counterclaim, Pathway argues that the contract was not only a financing agreement, but "was also a service contract, which meant that MidCap would supply Pathway with the following services:"

- Industry leading systems, analytics and media expertise ("S.A.M.E.") to insure that Pathway's marketing campaigns financed by MidCap would be stable and healthy.

- Basic financing software ("B.F.S.") to ensure that the details of the financing provided under the Contract could be accurately tracked.

- Use of S.A.M.E. to carefully monitor and identify fraud, as well as marketing campaigns which were not performing profitably.

As Coulter tells it, Pathway borrowed $1.5 million to fund online advertising for its credit monitoring product, and then gave the advertisers complete control for where and how quickly that money was spent, with a budget of up to the full $1.5 million Pathway was borrowing. Coulter also claims he gave away all oversight of these advertisers to Pathway's lender. So, though the only way Pathway made money was through online advertising that drove customers to it, Coulter claims that Pathway contracted with others to oversee every aspect of the decision making related to that advertising. And he claims this even though the relevant contracts do *not* in fact say that. *Pathway* (not MidCap) had the right to set budgets for the advertisers. And *the advertisers* (not MidCap) were to track the ads and their success, which *Pathway* (not MidCap) was to confirm. And though MidCap had the right to receive information from Pathway about the advertising, the contract did not mandate that it do anything more than approve the media buyers, if it so chose. The only conclusion the Court can reach from Coulter's testimony on these points is either (1) Coulter was grossly negligent in managing his business and understanding its contracts; or (2) Coulter's claims

---

- •       Sophisticated market intelligence to track the tricks of bad marketing partners/affiliates.

- •       Weekly recommendations and analyses.

Dkt. No. 8 at ¶ 3. But such promises are nowhere to be found in the contract. Indeed, a search of the contract reflects that neither the acronyms, nor the full phrases for, "S.A.M.E." or "B.F.S."—or any analog thereof—are ever mentioned. The contract also does not once state that MidCap would monitor or identify fraud, nor does it ever reference that MidCap was obligated to use market intelligence to track bad marketing partners.

Dkt. No. 22 at 7. Despite the fact that these claims were dismissed, Coulter and Pathway have continued to doggedly bring them up. Even after trial, in its closing brief, Pathway repeats verbatim the bullet points quoted above—"promises" the Court concluded were " nowhere to be found in the contract." Dkt. No. 91 at 6. These claims have no merit, and continuing to make them further undermines Coulter and Pathway's credibility regarding their understanding of their own contracts.

are just excuses for Pathway not repaying a debt it couldn't afford.  Neither possibility is helpful to Pathway.

Further evidence to support these conclusions is the fact that at least two of the "minimum performance standards" Coulter claims MidCap was to assess before making the weekly payments were impossible to determine from the face of an invoice.  The standards are somewhat cryptic, but are set forth in Exhibit B to the Agreement:

| CPA (average) | < $60 | Credit Card Reserve | < 5% |
|---|---|---|---|
| Active Member Database | > 2500 | Chargebacks (VI/MC) | < 1.5% |
| Debt/Active Customer | < $50:1 | Refunds | < 10% |

P-5 at 19.  While Affiliate Media's invoices reported a "CPA" figure on their face,[11] and both "active member database" and the debt to active customer ratio could presumably have been determined by access to Pathway's records, it would be impossible to determine at the time an invoice is presented for payment what the percentage of chargebacks and refunds were for that particular advertising. Both chargebacks and refunds take several months to show up, but the payment on invoices was due in 7 days, and MidCap was to fund invoices weekly.  Vol. 2 Tr. 70-71 (it takes three to six months for refunds to appear); Vol. 1 Tr. 82.  Therefore, reading the Agreement to require MidCap to reject invoices that did not meet the minimum performance standards conflicts with the reality that it was impossible to determine at the time an invoice became payable to the advertiser whether all standards

---

[11]The definition of "CPA" in the Affiliate Media/Pathway contract is "cost per action," and Pathway and MidCap apparently agree that the acronym in their contract referred to "cost per acquisition" (it is not defined in the Agreement).  Despite this slight difference, the parties apparently agree that the two uses of "CPA" refer to the same thing.

have been met. This buttresses the conclusion that the Agreement gives MidCap the right, but not the duty, to refuse to fund invoices that it finds do not meet these standards. As Hanington testified at trial, the minimum performance standards were "meant to be a benchmark, not necessarily a guillotine that immediately ends the campaign." Vol. 1 Tr. 86.

Cutting through all of Coulter's obfuscating and unreliable testimony, the Court finds that Pathway failed to prove by a preponderance of the evidence that MidCap breached any obligation in the Agreement when it paid the media invoices that Pathway presented to it for payment, and specifically finds that MidCap was not obligated by the Agreement—or anything else—to refuse to pay an invoice that did not meet the "minimum performance standards." However, as discussed in what follows, even if MidCap was obligated to confirm that the minimum standards were met before funding an invoice, Pathway failed to prove by a preponderance of the evidence that any of the invoices in fact fell below those standards.

###### b. Minimum Performance Standards

Pathway's evidence to support its claim that the invoices failed to meet the contractual minimum performance standards was extremely thin, and largely conclusory. The only evidence offered was Coulter's testimony. His focus was primarily on "CPA (average)" for which the Agreement set the standard "< $60." P-5 at 19. To demonstrate his claim, Coulter went through a stack of Affiliate Media invoices contained in D-30, took the total dollar figure for each invoice, and divided it by the number of new customers he claimed the invoice reported to have been obtained with that advertising, and reached what he contended was the "cost per acquisition," or CPA, for those customers. Vol. 1 Tr. 232-238. On each of the invoices contained in D-30, the figure Coulter arrived at using this methodology was higher than $60 per customer, and this, he claimed,

demonstrated each of these invoices failed to meet the "minimum performance standard" for that criterion. *Id.*

Once again, this testimony is not credible, and like so much of Coulter's testimony, it is inconsistent with his own contracts. In this instance, that contract is P-43, the advertising contract between Pathway and Affiliate Media. That contract covered a number of different media campaign types: Display Advertising, Cost Per Action, Cost Per Click, Cost Per Lead, Cost Per Sale, and Cost Per Install. *See* P-5 §§ 4-9. For each of these campaign types, the contract described how "delivery" of the desired outcome would be measured. For Cost Per Action, or CPA, campaigns the contract provided that the "Advertiser [Pathway] will submit acquisition counts to Agency [Affiliate] using one of two methods including placement of a tracking pixel on the Advertiser's confirmation page or through the use of Ad Code." P-5 § 5(a) (contract section references omitted). The two methods allow the tracking of customers who, starting with the online media placed by Affiliate, ultimately complete the steps to sign up for Pathway's services (a SmartCredit.com subscription). Further, Affiliate Media charged Pathway based on the CPA counts, and *Pathway* was to keep those counts:

> The Advertiser agrees to pay for each submission that results in the display of their Confirmation/Thank You page. Advertiser also agrees to supply Agency, via their Agency Account Representative, daily CPA Action totals for the first two weeks of their campaign and at least weekly thereafter. This daily information shall serve as confirmation that the Tracking Pixel system is enabled, as well as ensuring accuracy between Agency and the Advertiser's daily counts. If Advertiser fails to supply these reports Agency reserves the right to pause or cancel this Insertion Order,

P-5 § 5(a)(ii). In other words, the CPA count—the number of customers acquired through that particular media type—was fundamental to the contract between Pathway and Affiliate; indeed, it was the unit on which Affiliate charged for this type of advertising.

The charge for each of those customers is a more elusive figure, which Coulter attempted to exploit through his testimony on this point. The Affiliate Media contract was a two-part form. The bulk of it contained a detailed statement of all of the agreements related to the various campaign types, along with standard contractual agreements on payments terms, warranties, dispute resolution, etc. In addition to this "boilerplate," there was what is referred to as an Insertion Order, a one-page document that summarizes the type of campaign at issue, as well as the basic terms for that campaign, including the pricing. In this instance, the Insertion Order, which is the first page of P-43, contains several pieces of relevant information. The primary terms are in the middle of the page, and are divided into three columns, "Offer/Brand," "Payout," and "Deal Type." Under the "Offer/Brand" column there are three items. First, there is "Management Fee," which is listed as a $3,000 monthly fee. Second, there is "Media Spend," with no particular product identified, a "Payout" of 20%, and a "Deal Type" of "Override on Media Spend."[12] Finally, the last "Offer/Brand" listed is "SmartCredit.com," with the "Payout" being "Variable" and the "Deal Type" a "CPA Campaign," There was an additional note stating for both the Media Spend and CPA Campaigns that the approved budget was "TBD on a case-by-case basis and agreed upon via e-mail confirmation from both parties." P-43. In other words, Pathway and Affiliate agreed that the price per customer for the CPA campaign was going to be "variable," and decided on a case-by-case basis confirmed by email.

The only evidence of what the parties ultimately agreed the CPA would be are the invoices themselves. *See* D-30. To review one example, the Court will use the same invoice that was discussed repeatedly during trial, Invoice # 8808 dated 9/15/2013 (the second page of D-30). That

---

[12]From the invoices, it is clear that this meant that Affiliate would mark up the cost of ads covered by this section 20% over what Affiliate paid for the ads.

invoice contains four entries that resulted in charges to Pathway, each with a description, a unit price, a quantity, and an amount due:

| Description | Unit Price | Quantity | Amount |
|---|---|---|---|
| Non-Email 9.9 to 9.15.13 | 40.00 | 474 | 18,960.00 |
| Email Traffic | 45.00 | 57 | 2,565.00 |
| Pay Per Sale | 32.00 | 0 | 0.00 |
| Media Spend (19,177.96 X 120%) | 23,013.55 | 1 | 23,013.55 |
| Non-Email @ $50 Each | 50.00 | 69 | 3,450.00 |
| Excludes Make Good and Fatal adjustments to be included on separate invoice/Credit Memo. AID 1 $4,150.32 AID 5 $18,872.75 Total Media Spend $23,013.55 | | | |

Thus, there was a purchase of general advertising ("Media Spend") for which Affiliate paid $19,177.96, and which it then marked up 20% and charged Pathway $23,013.55. There were also three separate categories of CPA charges: "Non-Email," "Email Traffic" and "Non-Email @ $50 Each."[13] For those items, the unit prices ranged from $40 per action to $50. It is these last figures that are significant here. What this invoice shows is that the "cost per action"—or "cost per acquisition" as Pathway has referred to it—was set out on the face of the invoice, and, as noted in the Insertion Order, it was variable. It was $40 per customer for "Non-Email," $45 per customer for "Email Traffic," and then there was apparently a separate subset for certain "Non-Email" generated customers where the agreed price was $50 per customer. But the important point is that these figures represent *the CPAs Pathway paid under its agreement with Affiliate.*

Ignoring these figures, which are straightforwardly set out on each invoice, Coulter's argument at trial was that determining the CPA required a calculation based on each particular

---

[13]There is also a line item for "Pay Per Sale," at $32 per unit, but with zero units. This is repeated on the next five invoices in D-30, and in each there were zero sales. Given that the campaign was a "cost per action," not "cost per sale" campaign, the inclusion of this line item was likely an error, and it does not appear in later invoices.

invoice. For the invoice above, the calculation he claimed was required involved adding the total charges together ($47,998.55) and dividing it by the total customers listed in the "quantity" column (600), which would demonstrate the average cost per customer for this invoice ($79.99). What Coulter never explained was why the reference to "CPA" in the Agreement between Pathway and MidCap would have been to a totally different figure than the reference to "CPA" in Pathway's contract with its advertisers. As Hanington testified, "CPA" is a standard term used in the direct-response industry, and it has a specific meaning, different from what Coulter claimed:

> That's not a cost per acquisition at all and David would – David Coulter knows that, as well, in terms of what kind of advertising is done for CPAs versus standard could be banner, could be block ads, could be different pop-ups that goes into the 23,000, which would have been something that they determined between them and Affiliate Media.

Vol. 1 Tr. 119; *see also id.* at 156-57 (Hanington testimony: "And in your business would this media spend be considered in determination of costs per acquisition? No."). When a standard industry term is included in a contract, and is left undefined, a court should give that term the meaning given it in the industry. *RSUI Indemnity Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 n.1 (Tex. 2015) ("When construing undefined contractual terms, courts may consider the terms' commonly accepted meanings within the relevant industry.") Thus, the relevant CPAs on this invoice ($40, $45, and $50), as well as on every invoice in D-30, were less than $60, and thus within the minimum performance standard.

There are several other weaknesses in Pathway's position on CPA. First, "Media Spend," which it contends must factor into the "cost" side of the CPA calculation, is not explained in any of the evidence. But the language used in Exhibit B immediately preceding the performance standards states that the standards only applied to "[a]ll Smart Credit CPA offers funded by MCM." P-5 at 19.

The Insertion Order specifically differentiated between "Media Spend" and the SmartCredit.com CPA Campaign, suggesting that the CPA standard did not include "Media Spend." In addition, a number of the invoices that Coulter relied on to calculate CPA had two different figures regarding the number of customers acquired. First, there would be a statement in the "Quantity" column for each CPA charge, then there would also be a separate statement of "Total Payable Leads." In every instance, the "total leads" figure was higher (in some instances, significantly higher) than the figure Coulter used in his calculation. *See* D-30, all invoices except Invoice Nos. 8729, 8808, 8826, 8830, and 8859. When asked about why he did not use these figures in his calculation of CPA, Coulter had no explanation. Vol. 2 Tr. 58-60. And finally, the stated standard in Exhibit B-1 was "CPA (average)." P-5 at 19. One reasonable interpretation of this standard, given the use of the term "average," is that it focused on the average costs of all customers acquired through the financing agreement. Based on the most reliable evidence before the Court, the total amount financed by MidCap was $1,172,036.29, and the total customers acquired was 23,794, leading to an average CPA over the life of the Agreement of $49.25 per customer, well below the $60 standard. P-28E, cols. B and C. At the end of the day, Pathway totally failed to prove by a preponderance of the evidence that MidCap funded any invoices that failed to meet the CPA standard.

Coulter offered similarly unreliable testimony regarding the "Debt/Active Customer" standard, the only other standard Pathway claims was not met. As with CPA, there is no definition in the contract for this item. The standard stated in the contract is "< $50:1." Without explanation, Coulter testified that the proper way to judge whether this standard was met was on an invoice-by-invoice basis. Vol. 2 Tr. 68-70. Because MidCap was funding 100% of the costs of each invoice, and because the customers added by an invoice were stated on the invoice, he claimed therefore that

the calculation of "Debt/Active Customer" required use of the very same formula he used to calculate CPA. That is, he divided the total invoice costs by the total new customers noted on that invoice, and if an invoice resulted in a ratio of more than 50:1, he claimed that individual invoice failed to meet the relevant standard. Vol. 1 Tr. 200-203; 233-37. Coulter was never able to explain (at least in a cogent way) why the contract would have had two completely different standards (CPA and Debt/Active Customer) that used the exact same formula.

For a number of reasons, the Court rejects Coulter's claim on this point. First, it fails to comport with the plain meaning of the relevant terms, "debt" and "active customer." The use of these two terms as a ratio, in the context of Exhibit B, would mean the standard was viewing the debt financed by MidCap, in comparison to the *total* active customers Pathway had obtained through that financing. As noted early on in the findings of fact, the Agreement required Pathway to begin repaying MidCap within a week of an invoice being paid, which means that the debt figure would never be the same as the sum of all paid invoices, but instead would be lower than that figure.[14] And "active customers" was surely something that Pathway would be able to ascertain, yet it never offered evidence demonstrating what it claimed the correct number was at any given time. Indeed, other than the invoices—which are not the correct documents for the reasons noted—Pathway failed to offer any evidence showing what, at any given moment, its debt to active customer ratio was, much less demonstrate that it exceeded $50:1. The only figures the Court has on this come from the spreadsheets offered by MidCap, which appear to show that, over the life of the Agreement, Pathway

---

[14]The same is the case on a global basis. The records before the Court suggest that the total amount financed over the short life of the Agreement was $1,172,036.29, while, because Pathway was making payments on the debt, the highest the debt ever reached was $740,568.33. P-28E, col. C; P-29B, cell E49. Thus, using the total invoice payments as the figure for the "debt" portion of the Debt/Active Customer ratio is plainly incorrect.

obtained nearly 24,000 new customers from the invoices funded by MidCap. P-28E, col. B. Even using Coulter's incorrect figure of the gross loan amount (which is inflated as it does not take into account payments made) to make this calculation, the result is a ratio of $49.25:1, within the $50:1 standard. Using the more accurate figure of the highest amount the debt ever reached ($740,568), the overall ratio is $31.12:1.

In summary, Pathway's evidence completely failed to demonstrate that any of the invoices that MidCap funded under the parties' Agreement fell below the minimum standards set out in Exhibit B-1. Thus, even if the contract obligated MidCap to leave any invoice that did not meet these standards unpaid, the evidence fails to demonstrate MidCap ever breached the contract in that regard, as it fails to show any of the invoices fell below the minimum standards, as properly applied,

c.    Invoices

Pathway also argues that MidCap breached the contract by not sending weekly invoices stating how much Pathway owed MidCap. Under the Agreement, MidCap was required to "Invoice [Pathway] for any amounts paid to the Media Buyer for such Media Time . . . or for any other amounts due to [MidCap] . . . under this Agreement," on a weekly basis. P-5 at 5. The Agreement defined an Invoice as "any bill issued *by* [MidCap] to [Pathway] for amounts due to [MidCap] for providing Media Financing Services, the Services Fee, and or any other amounts due to [MidCap] under this Agreement." *Id.* at 2 (emphasis added). Pathway contends that MidCap failed to send these invoices. MidCap objects to this characterization, arguing that the spreadsheet relied on by the parties constituted invoices, and that it therefore performed under the Agreement.

As already explained in the Findings of Fact, the evidence demonstrates that MidCap in fact did not ever send Pathway a document titled "invoice." Instead, the parties adopted the use of a

master spreadsheet to keep track of what Pathway owed. Though not what the express terms of the Agreement anticipated, the spreadsheet became the method of invoicing between MidCap and Pathway.[15] Pathway argues that the spreadsheets were insufficient to meet the contractual obligation, and that failure to provide the formal invoices was a breach of the Agreement. Dkt. No. 91 at 6, 13 n.6. As noted in the Findings of Fact, the Court disagrees, and finds that the parties voluntarily and jointly adopted the spreadsheet as an alternate to invoicing. The Court finds that the use of the spreadsheet as a method of invoicing became the practice of the parties, and Pathway never objected to this practice before suit was filed. Moreover, the spreadsheet fulfilled the purpose of an invoice, which was to state on a weekly basis the amount Pathway owed MidCap. The spreadsheet clearly provided this information. Further, given that the spreadsheet contained everything that an invoice would have provided, even if MidCap's failure to send a weekly invoice breached the Agreement, Pathway failed to show how it was damaged by that breach. And to the extent Pathway uses this alleged breach as a defense to MidCap's suit for breach of contract, Pathway failed to show that the breach was sufficiently material to excuse it from repaying the amounts that MidCap advanced on Pathway's behalf. *Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 755 (Tex. 2013).

Accordingly, Pathway failed to carry its burden of proof to demonstrate that MidCap materially breached the Agreement.

---

[15]Vol. 1 Tr. 41 ("It was to simplify what was going to be an incredibly unruly invoicing process because each weekly funding for each particular affiliate network would generate 32 separate invoices that had different principal amounts that are owed and, also, different interest rates that were charged during that entire 32-week period. So there was no standardization. There was actually [Coulter's] suggestion that that spreadsheet be created to continue – to keep the invoicing process simple.").

**B.     MidCap's Breach of Contract Claim**

**1.     Liability**

Given the above conclusions, it follows that Pathway breached the agreement due to its non-payment.[16]  The Agreement states that: "[Pathway] agrees to pay [MidCap], when due and in full on the terms and conditions set forth in this Agreement, all Invoices rendered to [Pathway] by [MidCap], to the extent not paid out of the revenues."  P-5 at 9.  Failure to repay this debt results in an "Event of Default," after which "[MidCap] may, at its sole option, declare all amounts due under any outstanding Invoices immediately due and payable, together with the rate of interest."  *Id.* at 12, 18.  Pathway does not dispute that it failed to repay the debt owed under the Agreement. *See* Dkt. No. 91 at 9 (stating that "MidCap failed to establish the second and fourth elements of its breach of contract claim"); Vol. 1 Tr. (testifying that no payments were made after April 2014).  Moreover, MidCap has presented evidence supporting this element, showing that Pathway failed to make its weekly payments beginning in March 2014, and after receiving a Notice to Cure letter in July 2014, failed to satisfy this debt.  Vol. 1 Tr. 56, 66–67; P-29A & 29B.  As such, MidCap has proven that Pathway breached the Agreement.

**2.     Damages**

MidCap has also proven that it suffered damages as a result of Pathway's breach of the Agreement.  As proof of its damages, MidCap presented several different spreadsheets, each purporting to show the amount MidCap funded, the amount of principal and interest Pathway paid, and the amount that is still due, which are contained in P-28 and P-29.  Pathway objects to the use

---

[16]The only respect in which Pathway claimed that MidCap did not perform are those just addressed, so the trial evidence demonstrated the existence of an agreement, performance of the agreement by MidCap, and non-payment by Pathway.

of these spreadsheets as evidence of the debt, contending that the spreadsheets are not reliable or accurate.

In this instance, it is MidCap that was sloppy in administering the contract. The amount MidCap claimed remained due was an ever-moving target at trial, which led to MidCap providing several different iterations of the spreadsheet. For example, P-28B to P-28E show all invoices funded, interest accrued at the rate provided in the Agreement, and payments made by Pathway through the date of the trial. Vol. 1 Tr. 57–60; *see also* P-5 at 31 (setting the schedule for repayment). Once Pathway began making interest-only payments in January 2014, the calculations needed to be changed. So, in March 2014, Chau sent an email to Coulter and Kho explaining that "[t]he spreadsheet can no longer be relied upon since it automatically drops the interest rates from 4% to 2.35% as time goes by even though principal payments have not been made." P-28A. She therefore attached an updated spreadsheet, changing the formulas used to calculate the interest owed each week. This calculation also accounted for the interest-only payments that began in January 2014. P-28D. At trial, MidCap also submitted yet another alternative— P-29A and B—which calculate interest at the flat rate of 18 percent per annum—as opposed to the variable interest rates set out in the Agreement—on all payments due before MidCap filed suit, and a 12 percent rate to all payments due after MidCap sent the Notice of Default. Vol. 1 Tr. 67-68. P-29A and P-29B then recalculate the principal still owed after applying the new interest rate. These recalculations, supposedly, were done to avoid the usury claim made by Pathway. The effect, however, has been to create confusion as to the correct interest to be applied to the debt, and the actual interest that remains due and owing. As a result, the Court finds that MidCap has failed to prove by a

preponderance of the evidence what amount of money it suffered in damages with regard to the interest accrued on the unpaid principal amounts due under the contract.

Thankfully, the spreadsheets are not entirely unusable. The total amount loaned by MidCap, and the total of all payments made by Pathway has remained constant throughout the various iterations of the spreadsheet. *Compare* P-28 D *with* P-29B. Further, Pathway has not presented any evidence to contradict MidCap's calculation of either the amount funded or the amount repaid.[17] In fact, Chau testified that she relied on the spreadsheets in determining what payments were due to MidCap under the Agreement. Chau Dep. 49:1-6, 52:12-16.[18] Thus, though there is insufficient evidence to determine the interest due on the loaned amounts, the evidence is sufficient to prove the amount MidCap advanced to Pathway, and the total payments made by Pathway. Thus, MidCap has proven by a preponderance of the evidence that MidCap financed $1,172,036.29 in total over the course of the Agreement. P-29B. It has also proven that, of this amount, Pathway repaid $486,978.18 over the course of the Agreement. *Id.* Thus, the preponderance of the evidence shows that MidCap's actual damages from Pathway's breach of its payment obligation was $685,058.11

### 3.       Pre- and post-judgment interest and attorney's fees

MidCap has also asserted that it is entitled to prejudgment and post-judgment interest, as well as attorney's fees. First, MidCap seeks prejudgment interest at a rate of twelve (12) percent per

---

[17]Coulter testified that Pathway made two payments in April 2014, which were not included in either spreadsheet. This brings the total paid by Pathway, according to Coulter, to $496,191.26. However, Pathway provided no evidence that any payments were made in April, and Hanington testified that all payments ceased in March 2014.

[18]Kho, at her deposition, repeated that the spreadsheets were "internal calculations." Kho Dep. 21:7–15, 22:5–23:8. However, she also stated that she never questioned "whether the information reflected on the spreadsheets . . . accurately reflect[ed] the amounts loaned by Midcap or amounts due by Pathway under the loan agreement." *Id.* 21:19–25.

annum. In diversity cases, prejudgment interest is calculated under state law. *Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222, 234 (5th Cir. 2002). In Texas, there are two bases for the award of prejudgment interest: statutory and general principles of equity. *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 499 (5th Cir. 2002). Breach of contract cases are governed by Texas common law, which "allows prejudgment interest to accrue at the same rate as postjudgment interest." *Id.* Where, as here, the contract provides for interest, post-judgment interest accrues "at a rate equal to the lesser of: (1) the rate specified in the contract . . . or (2) 18 percent a year." TEX. FIN. CODE § 304.002. The Agreement provides that MidCap may, in the event of default, declare all amounts due under the Agreement "immediately due and payable, without notice, together with the rate of interest set forth in paragraph 1(s)." P-5 at 13. Paragraph 1(s) sets "an annual percentage rate of twelve percent (12%) per annum . . . of the unpaid amount of each invoice." *Id.* at 4. Further, Texas law provides that "prejudgment interest begins to accrue on the earlier of: (1) 180 days after the date a defendant received written notice of a claim, or (2) the date suit is filed." *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 461 (N.D. Tex. 2016) (citing TEX. FIN. CODE § 340.104 and *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.3d 507, 532 (Tex. 1998)). MidCap sent the Notice of Default to Pathway, on July 25, 2014; 180 days later is January 21, 2015. MidCap filed suit two days after that date, on January 23, 2015. Accordingly, MidCap is entitled to prejudgment interest at a rate of twelve percent per annum, beginning January 21, 2015.

As for post-judgment interest, 28 U.S.C. § 1961(a) provides that judgments entered in federal district court shall bear interest "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the

calendar week preceding the date of the judgment."[19]  Post-judgment interest is compounded annually.  28 U.S.C. § 1961(b).  Thus, when the Court enters judgment consistent with this opinion, it will include post-judgment interest at the applicable rate for that week.

Finally, with regard to attorney's fees, the Agreement states that:

> If either party commences any action at law or in equity to enforce its rights under the Agreement . . . such party shall be entitled to recover from the other party its legal expenses, including attorneys' fees, in addition to any other relief to which it is otherwise entitled.

P-5 at 16.  *See also* TEX. CIV. PRAC. & REM. CODE § 38.001(8).  Thus, as the prevailing party in this suit, MidCap is entitled to recover its attorney's fees.

### 3.    Coulter's Individual Liability

MidCap contends that Coulter should be held personally liable under the Guaranty he executed alongside the Agreement.  P-5 at 25-29.  That Guaranty is a limited guaranty, however, and only applies to damages that arise out of specifically defined situations.  The clause that MidCap relies on here provided that Coulter guaranteed that Pathway would pay damages arising out of

> "[a]llow[ing] any employee, agent, consultant, or other third party under his control to engage in . . . [d]irect[ing] or [r]edirect[ing] any Credit Card Processor, merchant, account holder, bank, or any other third party who may receive, collect, hold, or disburse any of [Pathway's] Revenue **not to pay** [MidCap]."

P-5 at 25-56 (emphasis in original).  Relying on Coulter's communications with Newtek, MidCap alleges it is entitled to seek from Coulter individually the damages it suffered when he urged Newtek not to transfer funds to MidCap, and instead to pay those over to Coulter's Trust.

Though there is clear evidence that Coulter asked Newtek to send funds to his Trust, as opposed to holding the funds for MidCap (P-2 and P-3), there is no evidence that Newtek actually

---

[19] *See* http://www.federalreserve.gov/releases/h15/current/

did so, nor is there evidence that but for Coulter's demands, Newtek would have sent the funds to MidCap. In fact, MidCap had originally asked Newtek to hold the funds in August 2014, and Coulter's letters were not sent until December 2014. D-10. In the meantime, Hanington continued to email with Newtek, and agreed to reduce the percentage of the Newtek-processed funds it demanded from Newtek, months before Newtek received Coulter's letters. D-14 at 2. Regardless, there is no evidence in the record that Newtek ever considered sending funds to MidCap. *Id.* In fact, after receiving Coulter's letter, Newtek requested that *both* Pathway and MidCap withdraw their requests. *Id.* at 3. As such, there is no evidence Coulter's actions caused Newtek to refuse MidCap's request, or that MidCap suffered any damage as a result of Coulter's communications with Newtek. MidCap failed to carry its burden of proof on this claim.

## C.     Pathway's Tortious Interference Counterclaim

Finally, and also based on the episode with Newtek, Pathway contends that MidCap's demand for funds from Newtek was a tortious interference with the Pathway/Newtek contract. To recover on this claim, Pathway must show "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). Further, "a defendant may negate liability on the ground that its conduct was privileged or justified." *Id.* at 77-78. A "defendant's interference is legally justified or excused if (1) the interference was done in a bona fide exercise of the defendant's own rights or (2) the defendant had an equal or superior right in the subject matter to that of the plaintiff." *Personal Preference Video, Inc. v. Home Box Office, Inc.*, 986 F.2d 110, 111 (5th Cir. 1993). "This privilege extends to good faith assertions of colorable legal rights." *Id.*

When Pathway defaulted on the loan, MidCap sought to recover a portion of the funds Pathway was owed by Newtek, who was Pathway's credit card processor. In a letter to Newtek, MidCap informed the company of the Limited Power of Attorney included in the Agreement, which gave MidCap power to "notify and otherwise direct and collect from any third party 'all proceeds from all revenues derived or generated from the sale of the Funding Project products or services.'" P-1 at 1. Based on this agreement, MidCap requested Newtek to hold all of Pathway's funds until further notice, rather than forwarding the funds to Pathway. *Id.* Eventually, Coulter and Pathway demanded that Newtek distribute the held funds to a trust owned by Coulter. P-2. Newtek rejected each party's attempt to procure the funds, and asked the parties to withdraw their requests. D-14 at 3. As a result, Newtek stopped processing funds for Pathway for a short time and retained nearly thirty thousand dollars, which otherwise would have been due to Pathway. Vol. 1 Tr. 210. As noted in the Findings of Fact, Newtek ultimately transmitted these funds to Pathway, and began processing payments once more. *Id.* 219. Pathway contends that it lost nearly ten thousand customers during that period. Vol. 2 Tr. 35. MidCap asserts that it was justified by the security interest granted it in the Agreement in making the demand for funds from Newtek, and in the alternative, that Pathway has failed to prove any damages.

MidCap has shown that it made a good faith assertion of a colorable legal right. In the Agreement, Pathway agreed that MidCap "shall have all the rights of a secured party under the Texas Uniform Commercial Code." P-5 at 13. The Agreement also gave MidCap "all right, title and interest to the Revenue . . . for the duration of the Agreement and . . . so long as there are outstanding amounts from any Invoices," *id.* at 9, as well as the right to "collect the payments, rents, income, and revenues from the Collateral" and to "notify account debtors and obligors on any Collateral to make

34

payments directly to [MidCap]." *Id.* at 14. Coulter, as CEO of Pathway, signed a Limited Power of Attorney, which gave MidCap the right to "notify and otherwise direct and collect, on [Pathway's] behalf, . . . any and all third parties to pay over to [MidCap] all proceeds from all revenues derived or generated from the sale of the Funding Project products or services until such time and all obligations . . . are paid in their entirety." *Id.* at 24. The Power of Attorney directed that MidCap has the "right but not the obligation to demand payment and to commence litigation against any party who owes or might owe any of the revenues otherwise payable to [Pathway]." *Id.* This is further supported by the fact that the Agreement originally called for a merchant processor to split the proceeds of the Funding Project between MidCap and Pathway, paying 65% directly to MidCap, and the remaining 35% to Pathway. *Id.* at 31. Pathway offers only a conclusory statement that this interference was outside the scope of the Limited Power of Attorney, yet it fails to explain how MidCap's letter seeking to recover the funds from Newtek is at odds with, or outside of, the Power of Attorney and the terms of the contract. In fact, MidCap's actions appear to have been exactly what the Agreement anticipated and provided for. Accordingly, MidCap has shown that it was justified in the actions it took.

Moreover, even were this Court to find that MidCap had not proven justification, Pathway completely failed to prove any damages from the alleged interference. The only damages evidence Pathway offered was testimony from Coulter, based on a document that was never offered or admitted into evidence. In brief, Coulter claimed at trial that during the time Newtek was not processing payments, Pathway "couldn't process a monthly fee for 9,453 customers at around 24.95 apiece." Vol. 1 Tr. 227. At trial he claimed those 9,453 customers were identified in a document identified as D-27, which was a list of names over 200 pages long. Coulter was unable to explain

35

when or how that list was generated.  *Id.* at 219-20.  Nevertheless, using the 9,453 customers and $24.95 figure, he testified that at a minimum, Pathway lost at least one month of fees from each of these customers, which totaled $235,852.35.  *Id.* at 227-28.

Though there are many problems with this testimony[20] the Court need not address them, as MidCap properly objected to Coulter's testimony.  The objection was based on Pathway's failure to supplement its responses to MidCap's damages interrogatories to disclose Coulter's calculation.  When Coulter offered the testimony at trial, MidCap objected.  Rather than address the discovery issue at trial, the Court instructed MidCap to raise that issue in its post-trial brief, Vol. 1 Tr. at 227-32, which it has done.  The relevant interrogatory asked Pathway to "identify each category of damages and the corresponding amount of such damages You are seeking to recover in this Lawsuit."  Dkt. No. 89-1 at 10.  Pathway's response was that the question was premature, and discovery was ongoing.  *Id.*  There is no dispute that Pathway never supplemented this response.  Clearly, MidCap was prejudiced by that failure, as it had no way to vet Coulter's claim, first made at trial, that Pathway had lost over 9,000 customers because of the Newtek episode, and investigate precisely how Coulter determined that.  Accordingly, pursuant to FED. R. CIV. P. 37(c)(1), the Court will strike this testimony, and not consider it here.  Thus, even if it had proven its tortious interference claim related to Newtek, Pathway failed to carry its burden of proof to show it suffered any damages as a result.

---

[20]For example, when the Court pointed out that a substantial number of the customers listed on D-27 were listed as acquired in 2015—after the Newtek episode—Coulter was unable to explain why that would be.  Vol. 2 Tr. at 86-87.  Then, in its post-trial brief, Pathway repudiated the list as the proper source of Coulter's customer figure, and instead stated it would rely solely on Coulter's trial testimony.  Dkt. No. 91 at 19 n.7.  But Coulter offered no evidence or testimony (other than the list) of how he came up with his number of 9,453, or how he knew those customers had been "lost" due to the Newtek issues.  Rather, he appeared to just pull that number out of thin air.

### III. CONCLUSION

In summary, the Court finds that MidCap proved by a preponderance of the evidence that Pathway breached the Agreement by failing to repay MidCap for funds financed under the Agreement, and that MidCap suffered damages in the amount of $685,058.11. The Court additionally finds that Pathway failed to carry its burden of proof on both its defense based on breach of contract, and its affirmative claim for breach of contract, as well as on its claim of tortious interference with contract.

No later than July 6, 2018, MidCap shall file an advisory stating its calculation of the prejudgment interest accrued from January 21, 2015, through July 9, 2018. Prior to filing that advisory, it shall confer with counsel for Pathway to obtain confirmation that the calculation is correct. Upon receipt of that advisory, on July 9, 2018, the Court will enter judgment consistent with this Memorandum Opinion & Order, after which MidCap may submit its request for attorney's fees, consistent with the procedures set out in FED. R. CIV. P. 54(d)(2)(B) and Local Rule CV-7(j).

SIGNED this 28th day of June, 2018.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE